2026 IL App (1st) 251235
No. 1-25-1235

FIRST DISTRICT,
SIXTH DIVISION
July 10, 2026

| | | |
|---|---|---|
| WP VENTURE 4 LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff and Counterdefendant-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 CH 04933 |
| | ) | |
| LUTHER VILLAGE OWNERS CORPORATION, | ) | Honorable |
| | ) | Eve M. Reilly, |
| Defendant, Counterplaintiff, and Third- | ) | Judge Presiding. |
| Party Plainitff-Appellant | ) | |
| | ) | |
| | ) | |
| (Lutheran Home for the Aged, Inc., | ) | |
| | ) | |
| Third-Party Defendant-Appellee). | ) | |

JUSTICE GAMRATH delivered the judgment of the court, with opinion.
Justices Pucinski and Hyman concurred in the judgment and opinion.

**OPINION**

¶ 1     This action concerns a rent dispute between a landlord and tenant, involving a 99-year Cooperative Ground Lease signed in 1989. Luther Village is a senior housing community situated on land owned by Lutheran Home for the Aged, Inc. (LHA). Residents of Luther Village do not purchase their units; instead, they purchase shares in the Luther Village Owners Corporation (LVOC) and sign proprietary leases with LVOC for the use and occupancy of their units. Residents pay monthly rent to LVOC, which in turn pays rent under the Cooperative Ground Lease. Prior to 2018, this rent was paid to LHA. In 2018, LHA sold the rental income stream to WP Venture 4 LLC (WP4).

¶ 2        In 2020, WP4 filed suit against LVOC to enforce the rent formula in the lease. LVOC countersued for reformation of the lease, claiming a mistake in wording caused the rent to be calculated roughly 50% higher than what was intended and agreed upon by the parties. The trial court granted summary judgment to WP4 and LHA, finding LVOC's reformation claim was time-barred and precluded by estoppel certificates signed by LVOC. We reverse, finding the record contains disputed issues of material fact as to when LVOC knew or should have known of its claim and the meaning of the estoppel certificates, thus precluding summary judgment.

¶ 3                                    I. BACKGROUND

¶ 4                            A. The Cooperative Ground Lease

¶ 5        In the 1980s, real estate developer Charles H. Shaw Co. (Shaw) sought to develop a senior housing community (Luther Village) on 57 acres of land owned by LHA. The project was designed in two phases. Phase I included most of Luther Village's infrastructure, courtyard and villa buildings, and two multi-unit midrise buildings. Phase II consisted of two additional multi-unit midrise buildings developed after completion of Phase I.[1]

¶ 6        On November 8, 1989, the parties executed three leases. LHA as landlord and Shaw as tenant executed two temporary leases governing Phases I and II of the development process. Additionally, LHA as landlord and LVOC as tenant executed a Cooperative Ground Lease, which has a 99-year term with two 99-year extensions at LVOC's option.

¶ 7        Phase I was planned at 469,098 square feet, with an initial FMV of $3,179,000 for the land. The Phase I lease contains the following rent formula:

"[T]he Fair Market Value of the Demised Land shall be multiplied by ten percent (10%)

---

[1]The lease documents do not refer to either a "Phase I" or a "Phase II." Rather, those terms appear only in the parties' briefs and serve as shorthand for the project's development. The project was developed over several years.

and the product of such calculation shall be multiplied by a fraction the denominator of which is 469,098, and the numerator of which is the aggregate number of square feet of the Units on which Rent is accruing ***."

In other words:

$$\text{Rent} = \text{Fair Market Value (FMV)} \times 10\% \times \frac{\text{square feet of units on which rent is accruing}}{469{,}098}$$

The numerator of the fraction reflects the square footage of units built and sold, making the fraction a rent-abatement tool during development. Once all units were built and sold, the fraction approaches 1 based on the denominator in Phase I, and rent is a flat 10% of FMV.

¶ 8    Phase II was planned at 250,312 square feet, with an initial FMV of $1,696,000 for the land. The Phase II lease contained the same rent formula as Phase I, but with a different denominator:

$$\text{Rent} = \text{FMV} \times 10\% \times \frac{\text{square feet of units on which rent is accruing}}{250{,}312}$$

¶ 9    The Cooperative Ground Lease is identical to the Phase 1 lease regarding FMV ($3,179,000), square footage (469,098), and rent formula, which provides:

$$\text{Rent} = \text{FMV} \times 10\% \times \frac{\text{square feet of units on which rent is accruing}}{469{,}098}$$

This lease does not mention the additional 250,312 in square footage or $1,696,000 FMV contained in the Phase II lease. Rather, section 3.02 refers specifically to Exhibit C as a schedule of the anticipated square footage of each unit, "which Landlord and Tenant hereby agree shall be used in the calculation of Rent."

¶ 10    Exhibit C lists the total square footage of all units as approximately 469,098. However, Phases I and II units now cover roughly 700,865[2] square feet. When using the formula with a denominator of 469,098 for the completed units, the resulting fraction is approximately 1.49 (700,865 ÷ 469,098). This calculation would require LVOC to pay 14.9% of the Fair Market Value instead of 10%.

¶ 11    LVOC asserts this was a mistake, and the parties intended the fraction to be 1, with rent to be set at 10% of FMV, just as in the Phase I and Phase II leases. However, the rent calculation denominator was never updated to reflect the full square footage, no second Cooperative Ground Lease was executed when Phase II began, and Exhibit C still lists only about 469,098 square feet and identifies by name only the Phase I buildings, not the two midrise buildings in Phase II. Furthermore, section 3.02 of the Cooperative Ground Lease sets the land's initial FMV at $3,179,000, aligning with the Phase I lease and excluding the $1,696,000 from Phase II.

¶ 12    WP4 and LHA oppose LVOC's view, arguing that no mutual mistake occurred and that rent must be paid according to the lease terms, regardless of the previous course of performance.

¶ 13                    B. Course of Performance Between LVOC and LHA

¶ 14    Phase I began in 1989 or 1990, with the final unit sold in 1999. Phase II started in 1998, achieved completion in 1999, and the last unit was sold in June 2001. Upon construction completion in 1999, the development ground leases terminated, leaving only the Cooperative Ground Lease to govern the landlord-tenant relationship between LVOC and LHA.

¶ 15    During construction, each structure was assigned a planned area development (PAD) designation: PAD 1-34 for the 34 townhomes and PAD A-E for the commons building and the four midrise buildings. When a structure was completed and sold, LVOC would transfer its PAD

---

[2]This number, taken from LVOC's sworn interrogatory responses, is what the trial court ultimately used in computing rent owed, rather than the combined total denominator of 719,410.

into the demised land of the Cooperative Ground Lease via amendment, and its square footage would be added to the numerator of the fraction. As more units were built and sold, the amount of rent paid by LVOC steadily increased. In 1998, following the completion of PAD D (the third midrise building), rent increased to $391,036 (12.3% of FMV). In 1999, rent decreased to $363,856 (11.4% of FMV), despite the lease stating that rent shall never decrease.

¶ 16        The Cooperative Ground Lease provides that FMV is reappraised every 10 years, with a set process if the parties disagree. The lease's first FMV adjustment took place in 1999, when both parties agreed to FMV of $10,450,000. From 2000 to 2009, LVOC paid, and LHA accepted, rent of $1.045 million (10% of FMV). The final midrise building, PAD E, was completed in 1999, and all units were sold by 2001. However, the PAD E transferal amendment was not executed until decades later in 2018 when WP4 became involved.

¶ 17        The second FMV adjustment occurred in 2009. LHA obtained an appraisal of the property at $11,400,000, while LVOC obtained an appraisal at $9,030,000. In a letter dated March 23, 2009, LVOC asked LHA to accept its lower appraisal due to the ongoing recession. LVOC further stated it "does not believe that 10% is an appropriate rate to continue to use in determining the amount of ground rent" and proposed amending the lease to set rent at 7 to 7.5% of FMV. LHA rejected LVOC's proposal to amend the lease but compromised on the appraisal figure. At the end of July 2009, the parties agreed to set FMV in the amount of $10,900,00 for the next 10 years (through November 8, 2019) and calculate rent at 10% of that value. WP4 and LHA call this a "hiatus agreement" and argue the 10% rate was only intended to be temporary.

¶ 18                          C. WP4's Purchase of the Rental Income Stream

¶ 19        In 2017, LHA elected to auction the remainder of its interest in the rental stream under the initial term of the Cooperative Ground Lease. To market the transaction, it retained CBRE Group,

Inc. (CBRE). Relying on information supplied by LHA, CBRE prepared marketing materials representing that ground rent equaled 10% of FMV, with no reference to an additional multiplier. The materials advised prospective purchasers that the rent was "$1,090,000," reflecting 10% of the agreed-upon FMV of $10,900,000, and stated in pertinent part that rent "shall be calculated as follows: The Fair Market Value of the Land shall be multiplied by 10%."

¶ 20 WP4, as a prospective buyer, noticed the rent formula in the Cooperative Ground Lease contained a fraction not referenced in the marketing materials. WP4 asked CBRE about the fraction and was told to "assume" its value was 1. However, WP4 did its own calculations and surmised the actual value of the fraction was higher. Robert Brennan, the founding member of WP4, stated in a January 2018 e-mail to WP4 members that the numerator of the fraction "should be 717,493" and the stated rent formula of 10% of FMV was "way low." Another WP4 member, Geoff Wehling, replied that WP4 members "should talk to a lawyer about if the past precedent of not following the formula laid out in the lease for the previous reset could have any effect on us. Seems like no, but is a trap we should probably run." WP4 did not raise this issue with LVOC.

¶ 21 After two rounds of competitive bidding, WP4 won the rent auction in 2018. To enable WP4 to obtain financing for the transaction, LHA directed LVOC to execute a "Tenant Estoppel Certificate" providing, in relevant part, that the lease, as attached to the certificate, "is in full force and effect" and "has not been amended, modified, supplemented or superseded." The certificate also certifies there are no existing defaults and confirms the date to which rent is paid. LVOC was initially reluctant to execute the certificate and asked LHA to provide more information about the assignment transaction. In response, LHA gave LVOC a 2017 letter from its attorney, Andrew Tecson, entitled "Re: Summary of Process to Determine Rent." The letter

states, "Section 3.02 provides the rent shall be ten percent of the Fair Market Value of the land." There is no mention of any multiplier.

¶ 22    On March 16, 2018, LVOC executed the estoppel certificate, as required by Article 17 of the lease to prevent default. The certificate expressly states, "The most current rent payment paid by Tenant as of the date hereof, in the amount of $90,833.33 is allocable to that portion of the Term ending March 31, 2018." The $90,833.33 figure corresponds to one-twelfth of 10% of the 2018 FMV of $10,900,000.

¶ 23    Subsequently, WP4 discovered PAD E had not been transferred into the demised land via amendment and demanded that it be transferred as a condition of closing. On May 4, 2018, LVOC executed the amendment and LHA assigned the Cooperative Ground Lease to WP4.

¶ 24    A year later, in June 2019, WP4 and LVOC met for the first time to negotiate the third FMV adjustment. At that time, WP4 informed LVOC that it intended to enforce the lease provisions as written, including the rent multiplier. Following negotiations, the FMV for the next 10 years was set at $18,050,000. On December 6, 2019, LVOC issued a second estoppel certificate at WP4's request, and as required under Article 17 of the lease. This certificate utilized the same relevant wording as the first, but this time specifically states: "Monthly base rent, which is $150,416.67, has been paid by Tenant through December 21, 2019." The base rent of $150,416.67 is one-twelfth of 10% of the $18,050,000 FMV.

¶ 25                            D. The Present Action

¶ 26    On July 13, 2020, WP4 filed this lawsuit against LVOC. As amended, its complaint seeks a declaration that the rent formula under the Cooperative Ground Lease is [FMV] x [10%] x [700,865/469,098], and the rent as of January 2023 was $224,732.95. LVOC filed a counterclaim for reformation of the lease, seeking to reform the rent formula to [FMV] x [10%] to reflect what

it claims is the original intent. LHA was joined as a necessary party because of its residual lease interest in the Cooperative Ground Lease.

¶ 27    WP4, LVOC, and LHA filed cross-motions for summary judgment. LVOC argued it was entitled to summary judgment on its reformation counterclaim, since the evidence was clear and convincing that the original parties to the lease intended the rent to be 10% of FMV and acted in accordance with that intent for nearly 30 years. In support, LVOC presented testimony from William King, Shaw's former controller, who stated in an affidavit: "[I]t was always the intent of the parties that rent would be equal to 10% of the fair market value of the land on which Luther Village was built." According to King, the fraction in the rent formula was intended solely as a rent abatement mechanism during development. After Luther Village was completed and sold, "it was assumed that the 'fraction' was 1." The first time King heard of the fraction being used as a rent multiplier was when WP4 brought it up in June 2019.

¶ 28    In his deposition, King reiterated that the fraction was supposed to "max out" at 1. To his understanding, when the first Phase II unit sold, the denominator of the fraction should have been changed to include the total square footage of Phase I and Phase II. He was unsure if the Cooperative Ground Lease contained language to that effect; he was mainly involved in the financial side of the deal and did not help draft the contracts. He acknowledged the rent in 1998 exceeded 10% of FMV, but it was an "anomaly" or "accounting error" and the rent reduction the following year was "an attempt to correct [the] overpayment."

¶ 29    LVOC also presented the affidavit of Robert Winter, Shaw's former president, who said that Shaw and LHA agreed that 10% of FMV was a fair rate. Shaw would not have agreed to 15% because it would not have been competitive in the market.

¶ 30        LVOC additionally provided contemporary documentation regarding LHA's intent. On July 6, 1999, LHA's counsel sent a letter to Shaw regarding the first FMV adjustment and stating, "Assuming the enclosed is agreeable, kindly advise so that we may formally adopt this agreement." The attached rent chart states "RENT EQUALS 10% OF FMV" (emphasis in original). The July 20, 1999, minutes from LHA's board meeting state: "The agreement stipulates [LHA] is to receive 10% of the market value of the land annually." Similarly, the July 18, 2006, meeting minutes mention a discussion with LVOC's board which "centered around the last reappraisal of the property and the 10% we receive as a result of each ten year appraisal."

¶ 31        LVOC also cited the 2017 letter from LHA's counsel stating that "Section 3.02 provides the rent shall be ten percent of the Fair Market Value of the land" with no mention of any multiplier. According to the pleadings, LHA "never took any steps to notify LVOC that the representations in this letter were incorrect" and, in fact, "the first time LHA ever took the position that rent should be calculated at anything other than FMV x 10% post Phase II was during this litigation."

¶ 32        In its motion for summary judgment, WP4 argued that the language of the rent formula was unambiguous and claimed it had "overwhelming evidence" that the parties originally intended for the multiplier to reach around 1.5x when Luther Village was at full occupancy. It further argued that LVOC was estopped from contesting the rent formula, its reformation claim was time-barred, and WP4 was a good faith purchaser against whom reformation could not be asserted. LHA joined in WP4's motion, arguing it did not waive or alter its right to enforce the rent formula in the Cooperative Ground Lease as written.

¶ 33        In support of its assertion regarding the parties' intent, WP4 presented July 25, 1989, minutes from LHA's board meeting, stating the anticipated income from rent would be $500,000

a year after full occupancy (roughly 15.7% of the initial FMV of $3,179,000). Likewise, the April 27, 1992, board minutes state that Roger Paulsberg, the president of LHA, "indicated that when Luther Village is complete it will bring $500,000 a year into the Home."

¶ 34     In a deposition, Paulsberg testified that the multiplier was part of the lease from the very beginning, and it was the parties' intention that rent would be roughly $500,000 a year. He admitted he was not involved in the negotiations that led to the development of Luther Village and had only secondhand knowledge. Regarding the 10% agreement in conjunction with the second FMV adjustment in 2009, Paulsberg characterized it as a "hiatus for that ten-year period," after which "things would have reverted back to the terms of the lease from the very beginning." However, he did not recall any specifics of how the rent was calculated and could not recall the multiplier being applied to the rent calculation at any time.

¶ 35     John Durso, an attorney who represented LHA in negotiating and executing the Cooperative Ground Lease, submitted an affidavit stating it was his understanding the Cooperative Ground Lease accurately expressed the parties' intent regarding the amount of rent to be paid. As the trial court stated, "These affidavits alone create a question of material fact as to the intent of the parties and preclude summary judgment on the issue of reformation."

¶ 36     Nevertheless, the trial court granted WP4 and LHA's motions for summary judgment and denied LVOC's motion. The court rejected WP4's claim of being a good faith purchaser because WP4 asked about the fraction before buying and was told rent should be calculated as if the fraction was 1. However, the court determined that LVOC's signing of the estoppel certificates prevented reformation, stating LVOC "knew or should have known prior to signing the estoppel certificate in 2018 that [the rent provision] of the lease was incorrect." Additionally, the court found LVOC's reformation claim was barred by the 10-year statute of limitations, since it knew

or should have known about the issue with the rent formula in 1998, when the rent surpassed 10% of FMV. Furthermore, LVOC was aware or should have been aware in 2009, when it tried to change the rent formula, that the formula "could give rise to controversy."

¶ 37    On July 16, 2025, the trial court entered a final judgment in favor of WP4 and LHA and against LVOC, finding that LVOC owes $224,732.95 per month in rent under the Cooperative Ground Lease, and awarded WP4 $6,426,339.30 in back rent from November 2019 to June 2025.

¶ 38                                   II. ANALYSIS

¶ 39    We review the trial court's grant of summary judgment *de novo* (*Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008)), keeping in mind that summary judgment is only appropriate where "there is no genuine issue as to any material fact and *** the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2018). Thus, if there is any dispute as to the material facts, or if reasonable people could draw different inferences from the undisputed facts, summary judgment is not proper. *Palos Community Hospital v. Humana Insurance Co.*, 2025 IL App (1st) 231917, ¶ 91. In reviewing summary judgment, we construe the record strictly against the movant and liberally in favor of the nonmoving party. *Williams*, 228 Ill. 2d at 417.

¶ 40    LVOC argues that the trial court erred in granting summary judgment in favor of WP4 and LHA after finding LVOC was barred from pursuing its reformation claim due to the statute of limitations and the estoppel certificates it signed. We consider these contentions in turn.

¶ 41                              A. Statute of Limitations

¶ 42    Reformation claims for written leases have a 10-year statute of limitations. 735 ILCS 5/13-206 (West 2018). Initially, the parties dispute whether a reformation claim based on mutual mistake accrues as soon as the contract is executed (the "execution rule") or when plaintiff knew or reasonably should have known of the mistake (the "discovery rule"). Illinois courts are split

on this issue. In the 1983 case of *Beynon Building Corp. v. National Guardian Life Insurance Co.*, 118 Ill. App. 3d 754, 762 (1983), the court applied the execution rule to an action for reformation of a note and mortgage, holding the action accrued when the documents were first executed. More recently, we have departed from *Beynon* and applied the discovery rule to contractual claims based on mutual mistake. *Schons v. Monarch Insurance Co. of Ohio*, 214 Ill. App. 3d 601, 608 (1991) (reformation); *Karkazis v. Karkazis Enterprises, LLC*, 2015 IL App (2d) 140950-U (recission).

¶ 43          In keeping with *Schons* and *Karkazis*, we find the discovery rule applies here. Illinois courts apply the discovery rule "across a broad spectrum of litigation" to alleviate the otherwise harsh results that would be caused by statutes of limitation. *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 414 (1981). This is particularly pertinent where, as here, a party seeks reformation of a contract based upon mutual mistake. Clearly, the party seeking relief cannot invoke the aid of a court until it has learned of the mistake. *Schons*, 214 Ill. App. 3d at 608. As we observed in *Karkazis*:

> " 'Theoretically, [the] defendants could have asserted their reformation claim on the day that they executed the lease. But if they had recognized the mistake that day, they would have corrected it, obviating the need for a reformation claim. Indeed, the premise of a reformation claim is that the parties unwittingly signed an erroneous document ***.' " *Karkazis*, 2015 IL App (2d) 140950-U, ¶ 16 (quoting *JPMorgan Chase Bank, N.A. v. Alecta Real Estate North Michigan Avenue, Inc.*, No. 08 C 3018, 2010 WL 375615, at *12 (N.D. Ill. Jan. 21, 2010)).

See Restatement (Second) of Contracts § 157 (1981) ("A mistaken party's fault in failing to know or discover the facts before making the contract does not bar him from *** reformation ***.").

¶ 44      In *Schons*, 214 Ill. App. 3d at 606, plaintiff sought reformation of an insurance policy, alleging the insured intended to procure coverage for multiple entities, but by mistake only one entity was listed in the policy. We applied the discovery rule and held that plaintiff's cause of action did not accrue until she learned of the alleged mistake. *Id.* at 608-09. Although the *Schons* court noted that plaintiff was not a signatory to the contract, but a third-party judgment creditor with a beneficial interest in the contract (*id.* at 608), we find the reasoning persuasive in the case at hand, where the signatories to the agreement acted for decades as if the rent formula was FMV x 10%. See *Karkazis*, 2015 IL App (2d) 140950-U, ¶ 17 (discovery rule applied to action for rescission of quitclaim deed where parties acted inconsistently with the deed's execution for over a decade).

¶ 45      When the statute of limitations begins to run under the discovery rule is typically a question of fact, unless it is apparent from the undisputed facts, in which case it may be decided as a matter of law. *Rasgaitis v. Waterstone Financial Group, Inc.*, 2013 IL App (2d) 111112, ¶ 30; *Israel v. City of Chicago*, 2025 IL App (1st) 241290-U, ¶ 29 (undisputed facts clearly and straightforwardly showed plaintiff was aware of his defamation claim for years before filing suit). Here, we agree with LVOC that material factual disputes exist regarding when it knew or reasonably should have known of the alleged mistake in the rent formula. Accordingly, the issue cannot be resolved as a matter of law.

¶ 46      The record shows that LHA not only accepted rent calculated at 10% of FMV for decades but affirmatively confirmed this formula in its own communications and CBRE marketing

materials. A July 1999 letter from LHA's counsel to Shaw included a rent chart expressly stating "RENT EQUALS 10% OF FMV" (emphasis in original). Likewise, in 2017, LHA forwarded a letter from its counsel entitled "Re: Summary of Process to Determine Rent," reiterating that "Section 3.02 provides the rent shall be ten percent of the Fair Market Value of the land." CBRE marketing materials also indicate that LHA understood rent was set at 10%, without mentioning a higher rate that could have boosted bidding and benefited LHA.

¶ 47        Nonetheless, the trial court concluded that LVOC had notice of the alleged error in 1998, when the rent charged of $391,036 exceeded 10% of FMV ($3,179,000). But the record contains multiple factual disputes on this point. To begin, the Cooperative Ground Lease's initial FMV of $3,179,000 is identical to the FMV stated in the Phase I lease, while the Phase II lease sets the FMV of the Phase II land at $1,696,000. On their face, these documents raise a factual question as to whether the parties intended the FMV for Luther Village to remain fixed at $3,179,000 once Phase II commenced, or whether the Phase II FMV was intended to be added to the total. Adding the Phase II FMV sets a land value of roughly $5,000,000, resulting in $500,000 rent at 10%. This aligns with contemporaneous LHA board minutes estimating annual rental income at $500,000 and could explain the 1998 increase, or at least create a triable issue, particularly in light of King's testimony that the 1998 rent constituted an "overpayment" caused by an "accounting error," which the parties attempted to correct the following year by reducing the rent by approximately $27,000. Construing this evidence liberally in LVOC's favor (see *Williams*, 228 Ill. 2d at 417), we conclude that factual disputes remain as to whether LVOC should have known in 1998 that there was a mistake in the rent formula.

¶ 48        Nor does LVOC's 2009 effort to renegotiate the rent formula establish, as a matter of law, that it was aware of any underlying error. During those negotiations, LVOC asserted that

10% of FMV was too high "to continue to use" and proposed reducing the rate to 7 to 7.5%. LHA rejected the proposal and ultimately approved a 10-year extension at the same 10% rate. These negotiations are not inconsistent with LVOC's asserted understanding that the governing formula was 10% of FMV.

¶ 49    WP4 also relies on a March 12, 2009, memorandum from King, which calculated rent as 11.6% of FMV. But read in context, King was not referencing any multiplier; he was addressing the effect of the recession on FMV. Although the agreed-upon FMV from 2000 to 2009 was $10,450,000, LVOC's 2009 appraisal reflected an FMV of $9,030,000. Because the lease prohibits rent from decreasing, the rent would exceed 10% of LVOC's appraised FMV for reasons wholly unrelated to any multiplier. King's memorandum therefore does not support WP4's assertion that LVOC knew or should have known of an error in the rent formula.

¶ 50    In sum, factual disputes permeate the record concerning what LVOC knew or reasonably should have known about the rent formula, and the evidence is far from one-sided. *Cf. Israel*, 2025 IL App (1st) 241290-U, ¶ 29. Accordingly, the trial court erred by granting summary judgment to WP4 and LHA based on their statute of limitations defense.

¶ 51                                B. Estoppel Certificates

¶ 52    The trial court also erred in concluding, as a matter of law, that the estoppel certificates bar LVOC's reformation claim.

¶ 53    "An estoppel certificate is [a] signed statement by a party *** certifying for another's benefit that certain facts are correct ***." (Internal quotation marks omitted.) *K's Merchandise Mart, Inc. v. Northgate Ltd. Partnership*, 359 Ill. App. 3d 1137, 1143 (2005). A party who signs such a certificate may not later assert a contrary state of facts or advance claims inconsistent with

the certificate's representations. *Id.*; *Uncle Tom's, Inc. v. Lynn Plaza, LLC*, 2021 IL App (1st) 200205, ¶ 51.

¶ 54     LVOC maintains that the certificates it executed are not inconsistent with its reformation claim and, at minimum, are ambiguous, thereby precluding summary judgment. We agree.

¶ 55     The 2017 estoppel certificate provides, in relevant part:

"1. A true and correct copy of the Lease is attached hereto \*\*\*. The Lease is in full force and effect.

2. The Lease has not been amended, modified, supplemented or superseded except \*\*\* as set forth above.

3. To the best of Tenant's knowledge, (a) neither Landlord nor Tenant is in default under the Lease, and (b) no event has occurred which, with the passage of time or the giving of notice or both, would constitute a default by Landlord or Tenant.

4. The term of the Lease will expire on November 8, 2088 \*\*\*."

The 2019 estoppel certificate contains materially identical wording, except paragraph 3 reads, "To the knowledge of the undersigned, neither Landlord nor Tenant is in default under the Lease."

¶ 56     Critically, the certificates mirror the lease's boilerplate language but say nothing about how rent is calculated. As *K's Merchandise* cautions, parties preparing estoppel certificates "should be encouraged to make specific reference to known items of dispute, not rely on all-encompassing language of waiver." *K's Merchandise*, 359 Ill. App. 3d at 1144. Thus, an estoppel certificate "covers only (1) facts which are specifically set out, or (2) the course of performance under the lease, if the estoppel certificate states there are no defaults." *Id.* at 1145. Here, despite WP4's admitted concern about the rent formula, which was raised with its lender before the certificates

were requested, the certificates omit any reference to that issue. If WP4 intended the certificates to resolve the multiplier question, either it or LHA could have included language to that effect in the certificates presented to LVOC. They did not. Instead, paragraph 5 of each certificate lists the monthly amount of rent paid, and those amounts correspond to one-twelfth of 10% of FMV. The certificates also affirm that the tenant is not in default. These representations align with LVOC's asserted understanding of the rent formula, not with WP4's.

¶ 57     The 2019 certificate is particularly telling. It states: "Monthly base rent, which is $150,416.67, has been paid by Tenant through December 31, 2019." That figure reflects one-twelfth of 10% of the $18,050,000 FMV paid after the supposed "hiatus agreement" expired on November 8, 2019. The 2017 certificate likewise reflects monthly rent of $90,833.33, consistent with one-twelfth of 10% of the then-agreed FMV of $10,900,000. To WP4 and its lender, paragraph 5 was the most important portion of each estoppel certificate, and LHA and WP4 accepted certificates that expressly pegged rent to 10% of FMV and said LVOC was not in default. Their acceptance of those figures undermines their present claim that LVOC's position is inconsistent with the certificates. At a minimum, the estoppel certificates create ambiguity, which cannot be resolved on summary judgment. See *id.*

¶ 58     WP4's remaining arguments only highlight the factual disputes surrounding the certificates. WP4 contends that by certifying a "true and correct copy" of the lease, LVOC vouched for the accuracy of the lease's contents. We disagree. The phrase is reasonably read to mean only that the attached document is a genuine copy of the lease, not that LVOC was certifying the absence of any drafting error. See *People v. Shunick*, 2024 IL 129244, ¶ 48 (statement that "true and correct copies" were served did not certify the truth of the statements contained therein (emphasis omitted)). Likewise, LVOC's statement that the lease had not been "amended, modified,

supplemented or superseded" does not foreclose the possibility that the lease contained an original mistake.

¶ 59    WP4 also argues that LVOC's statement that the lease is in "full force and effect" necessarily affirms the rent multiplier. But that assertion is contradicted by the certificates' simultaneous statement that no default exists, despite LVOC having paid, and LHA having accepted, rent calculated at 10% of FMV for nearly two decades. WP4 relies on Paulsberg's testimony that the 10% rate from 2010 to 2019 was merely a temporary "hiatus agreement," after which the multiplier would "revert." But that testimony is disputed, and there is no document in the record referring to any so-called hiatus. Indeed, the July 27, 2009, agreement does not describe itself as a hiatus or temporary abatement; it simply states that "in accordance with the ground lease *** the ground rent will be recalculated at 10% of the $10,900,000" approved FMV. No special rental concession is mentioned. Furthermore, from 2000 to 2009, when no such agreement existed, LHA likewise accepted rent at 10% of FMV. These conflicting provisions and competing interpretations create ambiguity that cannot be resolved as a matter of law. See *Countryman v. Industrial Comm'n*, 292 Ill. App. 3d 738, 741 (1997).

¶ 60    WP4 further contends that LVOC knew or should have known of the alleged mistake before signing the certificates, pointing to a 2017 memorandum by LVOC's director of operations, Sandra Pearson, stating that the rent formula "was never revised," with a handwritten note stating, "mistake to not change." But as discussed, whether LVOC's understanding of a mistake is inconsistent with the certificates is itself a disputed factual question.

¶ 61    Finally, LHA and WP4 invoke *Excelsior Garage Parking, Inc. v. 1250 North Dearborn Condominium Ass'n*, 2015 IL App (1st) 133781, ¶ 30, emphasizing that estoppel certificates are "critical" in commercial transactions because they inform prospective buyers and lenders of the

lessee's understanding of the lease. But *Excelsior Garage* involved a certificate that expressly identified the disputed defaults and amounts claimed due. Here, by contrast, the certificates omit any reference to the rent-multiplier dispute. If LHA and WP4 sought LVOC's understanding of the rent multiplier in the lease agreement, they could have drafted the certificates accordingly. They did not. The certificates' silence, combined with their express recitation of rent consistent with 10% of FMV, creates ambiguity, not clarity.

¶ 62     Because the estoppel certificates are ambiguous, contain conflicting provisions, and do not clearly contradict LVOC's reformation claim, they cannot support summary judgment.

¶ 63                    C. Equitable Estoppel, Laches, and Burden of Proof

¶ 64     WP4 and LHA urge us to affirm summary judgment on alternative grounds not addressed by the trial court, such as equitable estoppel, laches, and failure to meet the burden of proof. While we may affirm the grant of summary judgment on any basis that appears in the record (*Brettman v. M & G Truck Brokerage, Inc.*, 2019 IL App (2d) 180236, ¶ 28), we are not required to do so. When multiple arguments remain unresolved, it is advisable to remand for further proceedings to allow the trial court to address these issues.

### III. CONCLUSION

¶ 65     As demonstrated in the briefs and during oral argument, the case is riddled with genuine questions of fact regarding the parties' intent. Additionally, there are significant issues surrounding the affirmative defenses that cannot be resolved on summary judgment. Therefore, we reverse the grant of summary judgment in favor of WP4 and LHA and against LVOC and remand for further proceedings. We also reverse WP4's award of $6,426,339.30 in back rent from November 2019 to June 2025.

¶ 66     Reversed and remanded.

*WP Venture 4 LLC v. Luther Village Owners Corp.*, 2026 IL App (1st) 251235

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 20-CH-04933; the Hon. Eve M. Reilly, Judge, presiding. |
| **Attorneys for Appellant:** | Albert L. Hogan, Alexander J. Kasparie, Ruixue (Rachel) Cheng, and Bonnie Huff, of Skadden, Arps, Slate, Meagher & Flom, LLP, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Mark H. Horwitch, Jacob B. Berger, Kaitlyn N. Kloss, of Tabet DiVito & Rothstein LLC, of Chicago, for appellee Lutheran Home For The Aged, Inc. |
| | Peter G. Rush, Rita M. Alliss Powers, Gregory E. Ostfeld, and David S. Repking, of Greenberg Traurig, LLP, of Chicago, for other appellee. |